John M. Morrison
MORRISON SHERWOOD WILSON DEOLA PLLP
401 North Last Chance Gulch · P.O. Box 557
Helena, Montana 59624-0557
(406) 442-3261
(406) 443-7294 facsimile
john@mswdlaw.com
*Attorneys for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
HELENA DIVISION**

| | |
|---|---|
| MARIA MOELLER and RON MOELLER,<br><br>Plaintiffs,<br><br>v.<br><br>THE ALIERA COMPANIES, INC.; TRINITY HEALTHSHARE; TIMOTHY MOSES, SHELLEY STEELE, CHASE MOSES, and DOES 1-10,<br><br>Defendants. | **Cause No. 6:20-cv-00022-SEH**<br><br>**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL** |

Come now the Plaintiffs, through counsel, and for their Amended Complaint in the above captioned matter allege as follows:

**Summary of claim**

1. Defendants sold catastrophic health coverage to Plaintiffs, called CarePlus Advantage, with a $10,000 deductible and 100% coverage of medical

expenses after that deductible was met up to a $500,000 cap. Defendants expressly promised to cover expenses associated with cancer, including chemotherapy. Defendants, covertly led by a man convicted of securities fraud and perjury but masquerading as an "ethical and religious" Christian sharing ministry, collected thousands of dollars in premiums from Plaintiffs. In early 2019, more than a year after Plaintiffs left their Blue Cross plan to enroll in CarePlus Advantage plan, Plaintiff Maria Moeller was diagnosed with primary peritoneal cancer. She underwent chemotherapy and subsequently surgery. More than $180,000 in medical bills were incurred. Defendants paid none of them. Instead they made bogus excuses that violated the express written promises and terms of the CarePlus Advantage plan and ignored Plaintiff's thoughtful appeals. Even after determining that they owed some portion of the bills, Defendants failed to make any payments, leaving hospitals and medical companies unpaid and Plaintiffs exposed to severe financial harm as they fought a dreaded disease.

**Parties**

2. Plaintiffs Maria and Ron Moeller are citizens and residents of Lewis and Clark County, State of Montana.

3. Defendant The Aliera Companies, Inc. (Aliera), is a Delaware for profit corporation, with its principal offices and place of business in the State of Georgia,

that is authorized to do business and doing business in the state of Montana. Aliera

sells and administers health insurance products.[1]

4. Defendant Trinity HealthShare, Inc. (Trinity), is a Delaware for profit

corporation with its principal offices and place of business in the State of Georgia,

that is authorized to do business and doing business in the state of Montana. On

information and belief, Aliera formed Trinity, both maintain office addresses at

5901 Peachtree Dunwoody Rd., Ste. 200, Atlanta, GA 30328, and at all material

times, Aliera acted as the authorized agent of Trinity.

5. On information and belief, Defendants Timothy Moses, Shelley

Steele, and Chase Moses, are citizens and residents of the state of Georgia and

founders and owners of Aliera and Trinity. On further information and belief,

these individual Defendants are the alter ego of Aliera and Trinity and have used

both as a subterfuge to defeat public convenience, justify wrong or perpetrate fraud

as detailed below.

---

[1] These products purport to be "healthcare sharing ministry" products and not
health insurance in order to dodge insurance regulation, but they are in fact health
insurance products and have been found to be such by the courts of Montana
(*Rowden v. Am. Evangelical Assoc.*, 2007 Mont. Dist. LEXIS 7) and by insurance
regulators. See, e.g., https://www.insurance.wa.gov/sites/default/files/documents/
aliera-investigation-report_0.pdf

6. Does 1 through 10 are parties presently unknown that were involved in misrepresentations made regarding the health insurance coverage sold to Plaintiffs and/or in the failure to properly handle Ms. Moeller's claims.

**Jurisdiction**

7. Subject matter jurisdiction in this Court is based on diversity of citizenship because the Plaintiffs are citizens and residents of Montana, Defendants are Delaware corporations with principal offices and places of business in the State of Georgia, the individual Defendants are citizens and residents of the State of Georgia and the amount in controversy exceeds $75,000 exclusive interests and costs. 28 U.S.C. § 1332.

8. This Court has personal jurisdiction over Defendants because they purposefully sold their health coverage product to Plaintiffs in the State of Montana, they handled the claims of Plaintiffs for medical expenses that were incurred in the State of Montana, they obtained licenses to do business in the State of Montana, they purported to maintain network agreements with healthcare providers in the State of Montana, and they engaged in conduct that resulted in the accrual of a tort action in the State of Montana, thereby injecting themselves in multiple ways into the affairs of the State of Montana.

**Venue**

9. Venue is appropriate in the Helena Division because the Defendants sold health coverage to Plaintiffs in this division, wrongfully failed to pay medical expenses due under the health plan in this division, and otherwise committed claim handling violations, breaches of contract, bad faith, and other torts in this division. 28 U.S.C. § 1391(b)(2).

**Factual Background—The Coverage**

10. In late 2017, Plaintiffs Maria Moeller and her husband Ron Moeller were shopping for health insurance. Ron had retired early from his career as an engineer with Lockheed Martin and he and Maria maintained a residency in Texas while traveling regularly. They had been covered by Blue Cross Blue Shield of Texas but premiums for 2018 went up significantly, causing them to look for more affordable coverage. Aliera advertised a health coverage plan called "CarePlus Advantage" that was substantially less expensive.

11. Maria and Ron liked Aliera's CarePlus Advantage Plan. It carried a $10,000 deductible, which Aliera called the "Member Shared Responsibility Amount" or "MSRA." The high deductible and $500,000 limit kept the premium, which Aliera called the "Pricing" and "Monthly Share Amount," to under $500 per month. Maria and Ron did not expect to incur large medical expenses, but Aliera promised to be there for them in the event they did. In fact, Aliera's brochure

promised specifically to protect Maria and Ron from the catastrophic expenses associated with cancer, which was one of the reasons Maria and Ron purchased the plan. Among Aliera's representations in the brochure were these:

> Looking for a health coverage that provides protection from life's major emergencies?
>
> Catastrophic health plans are simple to use. You pay covered healthcare expenses until your cost sharing portion is met (MSRA). Then the plan starts to pay 100% toward your covered medical bills.
>
> Once you meet your MSRA, our CarePlus Advantage (catastrophic) plans pay 100 percent of most services. Medical treatment for a serious illness or accident can cost thousands of dollars.
>
> You purchase a catastrophic cost sharing plan in which your plan covers 100% after your MRSA. This means that after your sharing portion is met, you pay $0 of covered medical bills at the hospital.
>
> These services can cost thousands of dollars and are likely much more than your cost sharing responsibility. In this scenario, you would just pay your MSRA of the covered expenses until you reach your out-of-pocket maximum.
>
> **What a relief!**
>
> **Examples of Covered Major Medical Events**
>
> - Heart Attack
>
> - Cancer
>
> - Trauma
>
> - Hospitalization
>
> - Surgery

Maria and Ron reasonably believed that the CarePlus Advantage plan offered by Aliera would provide the promised coverage with reasonable access to providers, which is required of all health plans.[2]

12.     Aliera's advertising brochure did not mention any sort of religious affiliation, but the website, which Ron and Maria reviewed before purchasing CarePlus Advantage, and the welcome letter emailed by Aliera, bearing the logo of Unity HealthShare, Inc. (Unity), contained a "Statement of Beliefs" that indicated the coverage was specifically tailored to Christians such as Maria and Ron:

> At the core of what we do, and how we relate to and engage with one another as a community of people, is a set of common beliefs. Our ***Statement of Shared Beliefs*** is as follows:
>
> 1. We believe that our personal rights and liberties originate from God and are bestowed on us by God.
> 2. We believe every individual has a fundamental religious right to worship God in his or her own way.
> 3. We believe it is our moral and ethical obligation to assist our fellow man when they are in need according to our available resources and opportunity.

---

[2] A fine print "General Legal Notice" at the back of the sales material claimed: This program is not an insurance company nor is it offered through an insurance company. This program does not guarantee or promise that your medical bills will be paid or assigned to others for payment. Whether anyone chooses to pay your medical bills will be totally voluntary. As such, this program should never be considered as a substitute for an insurance policy. Whether you receive any payments for medical expenses and whether or not this program continues to operate, you are always liable for any unpaid bills.
However, this language was inconspicuous, completely at odds with the promises, value proposition and risk purported to be assumed in the body of the sales material and would have rendered the coverage being sold illusory and worthless.

4. We believe it is our spiritual duty to God and our ethical duty to others to maintain a healthy lifestyle and avoid foods, behaviors or habits that produce sickness or disease to ourselves or others.
5. We believe it is our fundamental right of conscience to direct our own healthcare, in consultation with physicians, family or other valued advisors.

Being in good health and in compliance with the Statement of Beliefs, Maria and Ron completed the application for Aliera's Unity plan and were enrolled in the CarePlus Advantage plan with a $10,000 deductible and a $500,000 limit.

13. In early 2018 Maria and Ron moved to Helena, Montana. During the November to December 2018 enrollment period for 2019, Ron checked the Aliera Healthcare's website for St. Peter's Hospital, which is the only hospital in Helena. Ron clicked on the link for their "PHCS" plan and was redirected to the website of MultiPlan, a company that sells access to provider networks to health insurance plans and their members. Ron then entered the Helena zip code and "hospital" and St. Peter's Hospital came up. Satisfied their local hospital was available, Maria and Ron renewed their coverage with Aliera for 2019.

14. The plan purchased by Maria and Ron from Aliera for 2019 was affiliated not with Unity but with Trinity.[3] Nevertheless, it was also called

---

[3] The historical progression from Unity to Trinity is described below. Defendants automatically moved Plaintiffs and other customers into Trinity, which they created, when their relationship with Unity unraveled.

"CarePlus Advantage."  The Aliera advertising brochure for the Trinity "CarePlus

Advantage" product promised, among other things:

> "A catastrophic health plan that offers assistance with the cost of major medical expenses."

> "Once your MSRA is met, CarePlus Advantage pays 100% of most eligible services. Medical treatment for a serious illness or accident can cost thousands of dollars. With the support of a catastrophic plan, the possibility of a major medical emergency will not overwhelm your life."

> "Examples of medical expenses eligible for cost sharing" include "Cancer."

15.  The "Member Guide" issued in connection with the Trinity health

coverage promised:

> "Medical costs are shared on a per person per incident basis for illnesses or injuries incurring medical expenses after the membership effective date when medically necessary and provided by or under the direction of licensed physicians, osteopaths, urgent care facilities, clinics, emergency rooms, or hospitals (inpatient and outpatient), or other approved providers. Unless otherwise limited or excluded by these guidelines, medical expenses eligible for sharing include, but are not limited to, physician and hospital services, emergency medical care, surgical procedures, medical testing, x-rays, ambulance transportation, and prescriptions."

> Specific "eligible medical expenses" include, among others:

> **Cancer**. Cancer sharing eligibility is available immediately for new occurrences of cancer. Any pre-existing or recurring cancer condition is not eligible for sharing. Cancer sharing will not be available for individuals who have cancer at the time of or five (5) years prior to application.... Cancer is limited to the sharing in your limit, based on plan chosen. Please see appendix for your specific plan details."

**Chemotherapy.** Subject to cancer limitations. Eligible after MSRA at in-patient facility.[4]

16. The Member Guide enumerates 54 specific "Medical expenses not generally shared." These include abortion services, cosmetic surgery, infertility treatment, sexual dysfunction services, sexual transformation services, treatments not approved by the American Medical Association, and a host of other medical services. The exclusions do not include any treatment received by Plaintiff that is at issue in this case.

---

[4] The Member Guide, which was not provided until after Ron and Maria had been enrolled and had started to pay premiums, contained a disclaimer claiming: "This is not a legally binding agreement to reimburse any member for medical needs they may incur, but is instead an opportunity for members to care for one another in a time of need, to present their medical needs to other members as outlined in the membership guidelines. The financial assistance members receive will come from other members' monthly contributions that are placed in a sharing account, not from Trinity HealthShare."
The Member Guide also claims:
"The HCSM guidelines are provided as an outline for eligible needs in which contributions are shared in accordance with the members clearinghouse instructions. They are not for the purpose of describing to potential contributors the amount that will be shared on their behalf and do not create a legally enforceable right on the part of any contributor. Either these guidelines nor any other arrangement between contributors and Trinity HealthShare creates any rights for any contributor as a reciprocal beneficiary, as a third-party beneficiary, or otherwise."
The Member Guide further provides:
"By submitting monthly contributions, the contributors instruct Trinity HealthShare to share clearinghouse funds in accordance with the membership instructions."
This confusing language itself suggests the membership guidelines and instructions will be honored, and the disclaimer language purporting to create no legally enforceable rights contravenes the quoted sales material and Member Guide.

17. For this $10,000 deductible, $500,000 limit health plan, Defendants collected monthly premiums from Maria and Ron in the amount of $407 per month in 2018, which were increased to $468.77 beginning in June 2019. These payments, which Defendants called "contributions," were withdrawn directly from Ron and Maria's checking account and were paid by them faithfully every month throughout the duration of their CarePlus Advantage coverage.

**Factual Background—these Defendants (behind the curtain)[5]**

18. On information and belief, Aliera Healthcare Inc. was formed at the end of 2015 by Timothy Moses and his wife Shelley Steele as a for-profit corporation with headquarters in Atlanta. At material times, Steele was the CEO and their son, Chase Moses, was President. Tim Moses was "Executive Director" until April 2019 when he left to become a "business development specialist" at "Ciel Capital Group," a privately held Atlanta firm.

19. On information and belief, Tim Moses had been convicted of securities fraud and perjury in or about 2005 and was sentenced to 78 months (6 ½ years) in prison and ordered to pay more than $1.6 million in restitution. He also was ordered to five years of supervised probation beginning in early 2011. Federal

---

[5] Plaintiffs were unaware of any of the facts in this section when they agreed to do business with Defendants. These facts have since been reported in publicly available court documents and by investigative journalists. See, e.g., https://www.houstonchronicle.com/business/article/Buyer-Beware-When-religion-politics-health-14065418.php

prosecutors later sought to send him back to prison for allegedly violating the terms of his probation, including failing to make restitution payments, opening new lines of credit and not being truthful about his finances to his probation officer.

20. On further information and belief, Moses' probation ended in April 2015. Eight months later, he and his wife launched Aliera and began marketing what the company called "insurance alternatives." Soon after, Aliera joined forces with a small Virginia health-sharing ministry called Anabaptist Healthcare, run by Mennonites. A new "ministry" called Unity Healthshare was formed with Aliera in control of nearly all operations.

21. In or about 2018, the relationship between Aliera and Unity deteriorated and became adversarial. Aliera sued Unity in Georgia in August 2018, alleging breach of contract and claiming the leadership of Anabaptist "executed a scheme to cripple Aliera's entire business" by stealing intellectual property and freezing assets, according to the litigation. Anabaptist counterclaimed that Aliera had been deceptive and misused Unity membership funds — which were to remain separate from Aliera's — for its own purposes, including $150,000 in checks that Tim Moses wrote to himself.

22. On further information and belief, by the time Aliera parted ways with Anabaptist, it had already formed Trinity Healthshare Inc., populating it with Aliera employees and automatically moving Unity members, including Plaintiffs,

to Trinity unless they specifically opted out. In April 2019, the Georgia judge in the Unity case issued an injunction against Aliera to stop the transfer of money and members pending the outcome of the case.

23. In the summer of 2019, the Texas Insurance Department and the Texas Attorney General both took action against Aliera, accusing the company of using the health-sharing ministry concept to cash in on its religious appeal and in an effort to avoid insurance regulation.

24. On information and belief, the relationship between Aliera and Trinity is structured so that Aliera receives the lion's share of the premium revenue paid by unsuspecting consumers. Aliera retains 65% of all fees outright, and Trinity receives the remaining 35%. However, Trinity repays *from its 35%* share 54.2% of that amount to Aliera for various reimbursements. The remaining 44.3% of the 35% Trinity received is placed into a reserve account for member medical expenses. <u>Thus, only 15.5% of the premium is set aside for payment of claims; the rest goes to Aliera</u>. Trinity is simply used as a storefront and gets nothing in the arrangement. Aliera, on the other hand, gets *and keeps* over 84% of the premium dollars. Thus, CarePlus Advantage members are not sharing in the medical expenses of fellow Christians so much as they are simply giving money, unknowingly, to convicted fraudster Tim Moses and his wife and son.

**Factual Background—the Cancer**

25.     On or about January 2, 2019, Maria developed a sharp pain in her abdomen and was diagnosed with stage IIIC primary peritoneal cancer at Helena's St Peter's Hospital.  Maria and Ron gave St Peter's their Aliera card, which looked like this:



As with most cancer treatments, Maria's doctor recommended that she start chemotherapy as soon as possible and it was scheduled for January 7, 2019 at St. Peter's.  St. Peter's Hospital is a full-service, in-patient facility.  St. Peter's Cancer Treatment Center (CTC), which is part of St. Peter's Hospital, performs services on an out-patient basis.  Maria's chemotherapy was scheduled to take place at St. Peter's, but on an out-patient basis through the St. Peter's CTC, which is how chemotherapy is administered except in unusual circumstances.[6]

---

[6] See, e.g., https://www.mayoclinic.org/tests-procedures/chemotherapy/about/pac-20385033 (Most chemotherapy treatments are given in an outpatient clinic, which means most people are able to continue working and doing their usual activities

26. Just before receiving treatment, Maria's nurse told her and Ron that Aliera had refused to preauthorize Maria's chemotherapy contending it was out of network and outpatient. The nurse said she thought the outpatient requirement was especially odd. Maria and Ron decided to proceed with the treatment and seek solutions for the next round of treatment in six weeks and beyond.

27. On or about January 8, 2019, Ron called Aliera and asked why St Peter's was not in network, when the MultiPlan website said it was. Ron also asked what hospitals were in network and met their "in-patient" requirement. On January 14, 2019, Aliera emailed Ron instructions. The instructions stated that, in order to tell what hospitals were in network, after clicking on the PHCS and being directed to the MultiPlan site, Ron had to re-enter PHCS on that site along with the zip code. This time the MultiPlan site had a banner making it clear to Ron that the PHCS plan had to be entered. (Later the link would automatically limit the MultiPlan site to PHCS; presently the link simply says, "We're Sorry. The page you're searching for does not exist."). Aliera also recommended two in-network

_____

during chemotherapy.); https://www.cancertherapyadvisor.com/home/cancer-topics/general-oncology/inpatient-versus-outpatient-chemotherapy-benefits-risks-and-costs ("Chemotherapy treatment that was once delivered only in hospital environments is now administered primarily in outpatient environments."); http://www.jhconline.com/cancer-care-migrates-to-outpatient-setting-2.html (80% of cancer care, including chemotherapy, is being delivered in outpatient settings.)

facilities:  St. James Healthcare in Butte, which was 71 miles away, and Community Hospital of Anaconda, which was at least 73 miles away.   Ron was concerned that these distances would be cruel to Maria, who suffers from nausea and incontinence as a result of her chemotherapy.  To make the regular trips to these hospitals that are over an hour away—on winter roads--would require vomit bags and adult diapers.  Nevertheless, Ron called both facilities but was informed their chemotherapy treatment was also delivered on an outpatient basis.  The nurses at both facilities were sure that the plan would cover their chemotherapy and said they would call Aliera on Maria's behalf.

28.     Still on January 14, 2019, Ron emailed Aliera back saying the recommended facilities do not meet Aliera's in-patient requirement and asked: "How am I to make sure that my wife is eligible for cost sharing?"  Two days later, Aliera emailed back, saying: "We are diligently working on finding in-patient chemotherapy facilities who participate in our medical network.  Thank you for patience while we attempt to find the best possible solution."  Two days after that, January 18, 2019, Aliera emailed again saying: "Unfortunately, we were unable to locate any in-patient chemo treatment facilities within 100 miles of the zip code you requested participating with your medical provider, Multiplan PHCS. While uncommon given our large provider networks, sometimes special medical services

are not immediately available to our members. If you have any further questions, please contact our Member Services department at 844-834-3456."

29. After trying in vain to find a facility that would render the chemotherapy Maria needed on an in-patient basis, and researching what *special medical services* meant, Ron wrote back on to Aliera on January 22, 2019: "Why do you feel this is a Special Medical Service (nothing I've seen indicates it to be such). I cannot search for greater than 100 miles. Can you expand the search to include the continental US?"

30. Ron received no further response from Aliera. The hospitals in Butte and Anaconda did respond. St. James in Butte confirmed in a call with Ron that preauthorization was declined because they were not an "inpatient facility." Furthermore, the calling nurse said St. James' oncologist was not in-network. A nurse in Anaconda also told Ron that Community Hospital was no longer "in-network."

31. Covering cancer, as promised in the Aliera materials, requires covering chemotherapy. Moreover, the Member Guide (which was not provided to Ron and Maria until after they purchased coverage) expressly provided for chemotherapy coverage so long as it was performed at an inpatient facility and St. Peter's, St James, and Community are all inpatient hospitals. Nothing in any of the materials excluded chemotherapy unless it was rendered to patients who were

admitted to the hospital on an inpatient basis throughout the duration of the chemotherapy, which is done in only rare cases. Excluding outpatient chemotherapy, even when performed at an inpatient facility, has the effect of eliminating the cancer coverage promised to Ron and Maria on the face of the marketing materials and therefore eliminating a material reason that Ron and Maria purchased Aliera's coverage. It meant that Ron and Maria were being exposed to medical expenses that could ruin them financially.

32. Because Aliera and Trinity refused to pay for Maria's chemotherapy, or identify a treatment center where Maria could find chemotherapy they would cover, or even ultimately reply to Ron's emails, other provider companies began to step up to try to save Ron and Maria from financial ruin. A St Peter's nurse called Genentech and they agreed to provide a free lifetime supply of Avastin (the most expensive drug in Maria's treatment).

33. On or about February 8, 2019, Aliera sent its first Explanation of Benefits (EOB) to Maria and Ron. It stated: "Your plan does not provide shared amounts for this service, supply, or equipment. Services rendered by a non-participating provider are not covered."

34. Maria had a total of six chemo treatments, and about 10 doctor visits with labs, in Helena. Aliera also refused to cover the associated doctor visits.

35. On or about March 6, 2019, Ron wrote a letter to Aliera expressing why he believed the plan should cover the cancer service and medicine as the plan advertised and why costs of the supplier should be covered. Aliera did not respond. Ron resent the letter April 8, 2019 and May 22, 2019 by certified mail. These last two times the certified letters were signed for as received but neither letter was responded to in any way (not phone, nor email, nor letter).

36. On or about March 11, 2019, after Aliera and Trinity completely abandoned Maria and Ron (but continued to collect premiums from them), St. Peter's financial coordinator enrolled Maria in a program under which the hospital agreed to charge Maria and Ron 25% of Ron's annual income, payable over three years.

37. In April 2019, Maria was scheduled for surgery in connection with her cancer to be performed at Providence Hospital in Spokane by Dr. Elizabeth Grosen. Ron called Aliera and confirmed that the surgery would be covered. Ron went to the MultiPlan website and found that Dr. Grosen, Providence hospital, and anesthesiologists associated with Providence were in-network.

38. On May 1, 2019, Maria had a pre-surgery consultation with Dr. Grosen and gave her office Aliera's information.

39. Aliera issued EOBs dated March 8, April 12, June 7, July 12, October 9, and November 7, 2019, among others, all of which mirrored the February 8,

2019 EOB, stating: "Your plan does not provide shared amounts for this service, supply, or equipment. Services rendered by a non-participating provider are not covered."

40. On or about June 4, 2019, Maria had a surgery preparation meeting. Providence told Maria and Ron that the pre-authorization was not done correctly, but that Providence was taking care of it. After the surgery, Providence confirmed they had received pre-authorization.

41. On June 6, 2019, Maria had surgery at Providence and spent a week in the hospital recovering.

42. On or about July 17, 2019, Aliera issued another EOB that said the surgery preparation meeting was not covered.

43. On or about July 29, 2019, Ron and Maria received Aliera's July 23, 2019 EOB. It included a column for the total charge, one for the "reduction amount" which was purportedly the amount "saved using available pricing programs and network arrangements," one indicating how much Maria and Ron would pay based on the MSRA (deductible), and one stating how much the plan would pay. *All of the charges* appeared in the "reduction amount" column. This left nothing in the columns for Maria and Ron and for the plan. This was confusing to Ron, so the next day, he called Aliera to talk about the EOB. Aliera indicated that the charges were disputed and that Aliera had requested additional

information from Providence, which Providence had provided.  Aliera expected its review of the hospital submittal to take 30-60 days and told Ron he should receive another EOB which would clarify Maria's share of the costs.

44.     On or about September 9, 2019, Ron called Aliera to follow up after 60 days.  Aliera informed Ron that the 60 days were 60 business days.

45.     On or about September 17, 2019, Ron called Providence, which told him their records showed Providence called Aliera on August 23, 2019, and that Aliera told Providence the review would be finished in another 14 business days.

46.  On or about October 11, 2019, Ron called Providence again. Providence told Ron that Aleira told Providence they received requested records August 23, 2019, and to allow 30 to 90 business days for review.

47.     Providence gave Ron a list of its conversations with Aliera.  Ron was told that the original claim was pended July 18 or 19, 2019, on grounds that Aleira needed additional medical records.  Providence sent those records July 23, 2019. Aliera had indicated to Providence the record review would be done in early October, but then said it could take 90 business days.

48.     On or about October 11, 2019, Ron called Aliera and talked with "Nicole."  After mischaracterizing the September 9 call by suggesting that the 60-day time period began on that date, she asked for a moment to research.  She said Aliera received the medical records on July 27, 2019, and the review, by policy,

could take up to 90 business days.  She said she could not guarantee a decision would be made by then.  Ron asked Nicole about the 60 days and she said she was sorry about any misinformation Ron might have been given.  Ron asked Nicole when the 90 business days would be up, and she said about November 1.  Ron calculated the time period to extend through December 6, 2019.

49.    On November 24, 2019, Ron received two letters: one marked November 18 and the other November 19, 2019.  The November 18 letter incorrectly identified the dates of service as June 5, 2019, but the November 19 letter correctly identified the dates of service as January 2-28, 2019, for the charge amount of $11,863.66.  Both letters referred to an appeal they said Ron submitted on June 24, 2019, regarding medical services.  (In fact, Ron had sent a letter dated March 6, 2019, and resent it April 8 and May 22, 2019, but had not sent any letter dated or posted on June 24.)  The letters from Aliera said, "After careful review of your appeal and the medical services provided" … "Medical services requested are not considered eligible for sharing under the Trinity HealthShare Member Guidelines."  This latter quote followed a checked box.  There was no discussion of any of the concerns raised by Ron's letter some 8 ½ months earlier nor of any of the issues raised during Ron's repeated phone calls with Aliera.

50.    On or about December 3, 2019, Aliera issued an EOB showing total Providence related charges of $78,229.58, which it broke down into a $28,431.31

"reduction amount," a $39,798.27 (Aliera) plan pay amount, and $10,000 as Maria and Ron's share. The next day, Ron called Providence to let them know about the EOB. Providence did not confirm or deny whether the reduction amount was correct.

51. On December 23, 2019, Ron called and canceled the Aliera coverage for 2020. Aliera told Ron he would have to continue to make two more months of "share" payments. Ron did not agree with that and advised Aliera he would not pay them two more months or premiums. Notwithstanding its demand for two more months of premiums, Aliera said the cancellation would be effective December 31, 2019.

52. As 2020 began, Aliera stopped selling insurance in Montana and Ron and Maria became insured with Aetna.

53. Aliera issued a January 7, 2020 EOB showing the "reduced" amount" as $392.75.

54. On or about January 9, 2020, Ron called Providence. They said while Aliera finished their review on 11/25, Aliera told Providence it would take another 45 days for them to pay. Providence told Ron it would not send Maria a bill until it received payment from Aliera.

55. On or about January 28, 2020, Ron received a Providence bill for the total hospital costs. The bill showed that Aliera had paid nothing. The full amount was due, with a minimum payment of $3,300 expected by February 26, 2020.

56. On or about January 29, 2020, Ron called Providence financial counseling and spoke with "Rachelle," who said the notes showed the Providence billing department called Aliera and Aliera would not give an estimate on when the bill would be paid. Rachelle advised Ron to call the billing department, which he did. Ron spoke with "Melissa," who told Ron when they have no answer within 128 days, they send a bill to the patient in hopes the patient can do something about it. Melissa recommended that Ron call Aliera. She also told Ron Providence was no longer offering a 15% discount for paying within 30 days but would honor it based on our prior conversations.

57. On or about January 29, 2020, Ron called Aliera again and spoke to "Genoa" who told him that it would take 45 to 60 business days to make the payment and that only 37 days had passed. Genoa estimated the payment would be made on March 1. Genoa told Ron she was unable to access Aliera's computer system to determine if any payments had been made. Ron asked Genoa to call him back when the system was operating properly to provide accurate information. Genoa said a supervisor would call back in one to three days. Ron gave Genoa all the claim numbers from the December 3, 2019 EOB.

58. The same day, Ron called the Providence billing department again and told "Monica" about the new payment date. She said she would make a note of it but couldn't delay the due date unless she had an estimate from Aliera. Ron told Monica about the expected supervisor's call and she recommended Ron make it a conference call.

59. On January 30, 2020, Ron had a conference call with "Demetri" of Aliera and "Andi" of Providence. Demetri said the payment was processed on November 29, 2019 and could take up to 60 days for the payment to arrive, which meant the payment might not be received until March 1, 2020. Demetri mentioned that the hospital claim (a subset of all bills) totaled 60,661.78, that there was a PHCS in-network reduction of 21,228.10, that Ron and Maria's share would be $10,000, and that the plan would pay $29,423.66. Ron asked Andi if Providence agreed with the in-network reduction. Providence said they would have to see the paperwork and recommended that Ron wait for Providence to send another bill after the doctors' bills were included and the insurance payment was received.

60. On or about March 3, 2020, Ron called Aliera and spoke to "Chantae," who said the payment was in process with no estimate on when it would be made. Ron asked to be transferred to Demetri, the manager. Ron was transferred to Demtri, who said Aliera halted payments temporarily while they transferred funds from a third party to Trinity and claims were being processed in

the order they were received.  Demetri reported this could take 60 business days. Ron insisted on another conference call and Sarah of the Providence billing department was joined. Demetri told Sarah about the third-party transfer and that it could take 45 to 60 business days for the payment.  He gave Sarah a number Providence could call (844.646.1504) between 9am and 6pm EST and said Ron could call in a week for a status.

62. On or about March 4, 2020, Ron received a new bill from Providence with a past due notice.  Ron called Providence financial counseling and spoke again with Rachelle, who recommended Ron set up a payment plan.  The hospital bill (not including doctor bills) paid over 24 months came to $2485.49 per month. Ron suggested the amount be rounded to $2500/mo.  It would take 4 months before Ron exceeded his $10,000 deductible, which would allow time for Trinity's check to arrive.  Ron and Rachelle also talked about the 15% discount being no longer available.  Rachelle said her hands were tied on other options.

62. On or about March 4, 2020, Ron called Demetri again and told him they had been put on a payment plan for the hospital bill.  Demetri inquired if it was on the whole amount of the medical expenses and was surprised to hear it was.

63. As of the date of the filing of this Complaint, Maria's medical expenses, which she has been incurring for well over a year, have totaled $181,327.22 and, to Plaintiffs' knowledge, <u>neither Aliera nor Trinity has paid any</u>

amounts at all to Ron or Maria or any of Maria's providers for any of her medical expenses.

<u>**COUNT I**</u><br>**BREACH OF CONTRACT**

64. Plaintiffs incorporate by reference all prior allegations.

65. Plaintiffs and Defendants had a contractual relationship according to which Defendants collected premiums from Ron and Maria in return for the promise to protect them against the costs of cancer treatment, including chemotherapy, if these services became necessary. In particular, Defendants contractually agreed with Ron and Maria that, under such circumstances, they would pay 100% of such medical expenses after Ron and Maria paid a "MSRA" deductible amount of $10,000.

66. Ron and Maria fully performed their part of the contract by paying their premiums in full and on time.

67. Defendants breached their contract with Plaintiff not only by failing to pay Maria's medical expenses in excess of the $10,000 MSRA deductible, but also by failing to pay any of Maria's medical expenses at all.

68. As a direct and legal result of Defendants breaches of contract, Plaintiff Plaintiffs suffered the loss of their contract benefits, other consequential economic damages, attorney fees and costs.

## COUNT II
### UNFAIR CLAIMS SETTLEMENT PRACTICES

69.     Plaintiffs incorporate by reference all prior allegations.

70.     Defendants entered into a contract with Plaintiffs by which Defendants undertook to indemnify another or pay or provide a specified or determinable amount or benefit upon determinable contingencies, as described in the definition of insurance in § 33-1-201(5)(a), MCA.  Defendants also sold coverage to Plaintiffs for the purpose of indemnifying them for medical expenses resulting from accidents or sickness, as described in the definition of the business of insurance set for in § 33-1-207, MCA.

71.     Defendants sold Plaintiffs coverage that was similar in material respects to the Medi-Share coverage that the courts of Montana have found to be insurance despite fine print disclaimers to the contrary.[7]

---

[7] *Rowden v. Am. Evangelical Assoc.*, 2007 Mont. Dist. LEXIS 7, *6-7 (2007) ("Medi-Share instructs its members that …no guarantees exist that by paying their insurance premiums, medical bills will be paid. Medi-Share claims that because the written materials it provides to its members specify that it is not an insurance company and is not transacting the business of insurance, the Court need look no further. Medi-Share avers that the statutory exception to arbitration of insurance claims found it Section 27-5-114(2)(c), MCA, does not apply because of the voluntary nature of membership in Medi-Share which is based on Christian sharing, and the warning to members that their medical claims may, or may not, be paid. It is undisputed, however, that Medi-Share does undertake to indemnify members by paying "a specified or determinable amount or benefit upon determinable contingencies" based on claims handling guidelines, as referenced in the statutory definition of "insurance" set forth in Section 33-1-201(5)(a), MCA. Medi-Share's literature which reiterates that reimbursement for medical expenses is

72. Trinity was specifically found to be an insurer and the health coverage Aliera and Trinity sold to Plaintiffs was specifically found to be insurance by the Insurance Department of Washington State at the very time that Plaintiffs purchased the "CarePlus Advantage" plan. While Trinity claims to be a Health Care Sharing Ministry (HCSM), which is a term used in the Affordable Care Act at 26 USC §5000A(d)(2)(B)(ii), as opposed to insurance, the Washington Insurance Department in 2018-2019 found: "Trinity does not meet the definition of a HCSM because (1) its representations about the nature of its religious convictions to consumers, State and Federal regulators are contradictory and in conflict with its own bylaws, (2) it has not been operating as a 501(c)(3) legal entity and sharing member medical needs continuously since December 31, 1999, and (3) evidence indicates Trinity was formed in 2018 for the express purpose of entering into a marketing agreement with Aliera."[8] Further, on information and belief, in April 2018, Aliera entered into a voluntary Consent Order with the Maryland Insurance Department, following an investigation that began in 2016, in which it agreed that its CarePlus Advantage plan was in fact subject to insurance regulation and that it would cease and desist doing business in that state.[9] The Texas Insurance

---

not guaranteed, appears to be stated solely to avoid regulation by the Insurance Commissioner….

[8] https://www.insurance.wa.gov/sites/default/files/documents/aliera-investigation-report_0.pdf

[9] https://www.insurancejournal.com/news/east/2020/03/02/559863.htm

Department also sued Aliera in 2019 to stop it from selling insurance without a license and the courts of Texas issued an injunctive order prohibiting Aliera, its successors, affiliates, agents, and assigns, from accepting any new customers in Texas.[10]

73. On information and belief, Aliera not only sold and administered health insurance, but actively held and controlled funds, including funds which it refused to return to Unity when the relationship between those companies ended, and acted as an insurer itself.

74. Defendants and each of them were, at material times, insurers within the meaning of §§ 33-18-242 and 33-1-201(6), MCA.[11]

75. By engaging in the conduct alleged herein, Defendants misrepresented pertinent facts and insurance policy provisions relating to Plaintiffs' health insurance, refused to pay claims without conducting a reasonable investigation based upon all available information, failed to affirm or deny coverage of claims within a reasonable time after proof of loss statements had been completed, and neglected to

---

[10] https://www.tdi.texas.gov/news/2019/tdi05172019-faq.html

[11] Because the health coverage sold by Aliera and affiliated with Unity and Trinity was insurance, the arbitration clause, which is buried at page 21 of the Member Guide and only provided to members after they enroll in the plan, is void under Montana law that regulates the business of insurance. See, *Rowden*, 2007 Mont. Dist. LEXIS 7, *9 ("Because Medi-Share is in the insurance business, its motion to compel binding arbitration is denied pursuant to Section 27-5-114(2)(c), MCA, which voids arbitration provisions in insurance disputes.")

attempt in good faith to effectuate prompt, fair, and equitable settlements of claims in which liability has become reasonably clear, in violation of § 33-18-201(1), (4), (5), and (6), MCA, the Montana Unfair Claims Settlement Practices Act (UCSPA).

76. As a direct and legal result of Defendants' violations of the UCSPA, Plaintiffs have suffered and continue to suffer economic and non-economic damages, including severe emotional distress, entitling them to the full measure of relief under § 33-18-242, MCA.

## COUNT III
### FRAUDULENT INDUCEMENT

77. Plaintiffs incorporate by reference all prior allegations.

78. Defendants, in advertising material provided to plaintiffs in late 2017 and 2018, as detailed in paragraphs 11 through 15 above, intentionally induced plaintiffs to purchase, keep, pay for and rely on the Aliera/Unity/Trinity health insurance by saying that after Ron and Maria met their MSRA deductible, the plan would pay 100% of their covered medical bills. In particular, Aliera promised, "Our CarePlus Advantage (catastrophic) plans pay 100% of most services" and "You purchase a catastrophic cost sharing plan in which your plan covers 100% after your MRSA. This means that after your sharing portion is met, you pay $0 of covered medical bills at the hospital." Aliera and Trinity promised, "Once your MSRA is met, CarePlus Advantage pays 100% of most eligible services" and "With Trinity HealthShare's CarePlus Advantage, members will enjoy peace of

mind in the event of a catastrophic incident. A member will only pay out-of-pocket for non-catastrophic medical expenses, such as an ear infection or flu shot," and "With CarePlus Advantage, after meeting the MSRA, eligible medical expenses are submitted for cost sharing at 100%. In this scenario, members pay only their MSRA for eligible expenses until reaching the out-of-pocket maximum." The brochure listed "Cancer" among the "Examples of Medical Expenses Eligible for Cost Sharing" and provided specifically for coverage for "Cancer" and "Chemotherapy."

79. The advertising material the Defendants used to induce plaintiffs to purchase, keep, pay for and rely on the CarePlus Advantage plan was false and concealed and did not disclose that Defendants would not provide coverage for chemotherapy rendered in its usual and nearly universal manner or that Defendants would, in fact, not pay any of Plaintiffs medical bills. The advertising material further was false and concealed and did not disclose that Defendants would delay adjudication of Plaintiffs' claims for months, would not even make decisions on many of Plaintiffs' claims and would not pay even the claims that it determined that it owed. The advertising material misrepresented that Plaintiffs would be protected from the expenses of a catastrophic medical illness and concealed and did not disclose that Plaintiffs would be entirely exposed to all of the medical

expenses associated with a serious illness such as cancer, thus putting Plaintiffs in jeopardy of severe financial harm or even financial ruin.

80. Even references to the Christian sharing aspects of the CarePlus Advantage plan sold to Plaintiffs falsely represented that members contributions would be used to pay eligible medical expenses. For example, the CarePlus Advantage card given to Ron and Maria, which purported to cover "Hospital," "In-Patient," and "Out-Patient," as well as "Rx," represented: "Members make monthly contributions that are used to voluntarily pay each other's medical expenses based on a shared set of ethical or religious beliefs."

81. Such representations by Defendants were false and further concealed and did not disclose that the payment or non-payment of their medical expenses would have nothing to do with a shared set of ethical or religious beliefs and that other members would never even be asked whether they wished to pay medical expenses incurred by Ron or Maria.

82. These misrepresentations by Defendants that induced plaintiffs to purchase, keep, pay for and rely on the CarePlus Advantage plan further concealed and did not disclose the appalling fact that Aliera and its owners would keep nearly 85% of the premium revenue and make only 15% of the revenue available for payment of claims, and the fact that Aliera and Trinity were for-profit companies that made decisions about whether to pay medical expenses based upon their own

financial interest and profit motive rather than based on any guidelines or on the generosity of other Christian members. And in their representations to Plaintiffs, which induced plaintiffs to purchase, keep, pay for and rely on the CarePlus Advantage plan, Defendants further concealed and did not disclose that Aliera principal Tim Moses had been convicted of securities fraud and perjury or that Aliera and its affiliates had been found by regulators and courts to be insurance and/or had been found to be fraudulent, and/or had been enjoined from selling its CarePlus Advantage plan and/or similar products in multiple states.

83. Defendants knew that each of these enumerated statements they made were false but intentionally made these statements anyway for the purpose of inducing Plaintiffs to buy, keep, pay for and rely on their CarePlus Advantage product. Defendants also knew each of the enumerated facts that they concealed and understood that each was material and Defendants deliberately concealed them in order to mislead and induce Plaintiffs to buy, keep, pay for and rely on their CarePlus Advantage product.

84. Ron and Maria did not know that the afore described representations by Defendants were false or of the concealed material facts and the justifiably relied on the information given to them by defendants as being true and accurate. Ron and Maria acted on such reliance by purchasing, keeping, paying for and relying on the CarePlus Advantage product. Ron and Maria have no education or

experience in health insurance but were especially confident in the protection they would receive from the CarePlus Advantage plan because of Defendants promised commitment to shared ethical and religious beliefs, which was the intended purpose of Defendants' scheme.

85. As a direct and legal result of the fraudulent inducement and Plaintiffs' justifiable and rightful reliance on Defendants' misrepresentations, Plaintiffs suffered economic and non-economic damages, including severe emotional distress, because they were left with tens of thousands of dollars of medical bills, none of which have been paid by defendants.

## COUNT IV
### DECEIT

86. Plaintiffs incorporate by reference all prior allegations.

87. The conduct of the Defendants and each of them as alleged herein, and particularly as detailed in paragraphs 11-15 and 78-82, also constitutes deceit as defined in § 27-1-712, MCA.

88. As a direct and legal result of the deceit and Plaintiffs' justifiable and rightful reliance on Defendants' misrepresentations, Plaintiffs suffered economic and non-economic damages, including severe emotional distress, because they were left with tens of thousands of dollars of medical bills none of which have been paid by defendants.

**COUNT V**
**CONSTRUCTIVE FRAUD**

89.     Plaintiffs incorporate by reference all prior allegations.

90.     The conduct of the Defendants and each of them as alleged herein, and particularly as detailed in paragraphs 11-15 and 78-82, if done without fraudulent intent, constitutes constructive fraud as defined in § 28-2-406, MCA.

91.     As a direct and legal result of the constructive fraud and Plaintiffs' justifiable and rightful reliance on Defendants' misrepresentations, Plaintiffs suffered economic and non-economic damages, including severe emotional distress, because they were left with tens of thousands of dollars of medical bills none of which have been paid by defendants.

**COUNT VI**
**NEGLIGENT MISREPRESENTATION**

92.     Plaintiffs incorporate by reference all prior allegations.

93.     The afore described representations by Defendants, particularly as detailed in paragraphs 11-15 and 78-82, also constituted negligent misrepresentation.  To wit: Defendants (1) supplied false information in the course of its business; (2) failed to exercise reasonable care in communicating the information; (3) Plaintiffs justifiably relied on the false information, which caused the their financial losses; (4) Plaintiffs are part of a limited group of persons for whose benefit and guidance the Defendant intended to supply the information; and

36

(5) Plaintiffs relied on the information in transactions that the Defendant knew the information would influence. The facts supporting each of these elements are set forth above.

94. As a direct and legal result of Defendants' negligent misrepresentation and Plaintiffs' justifiable and rightful reliance on Defendants' misrepresentations, Plaintiffs suffered economic and non-economic damages, including severe emotional distress, because they were left with tens of thousands of dollars of medical bills none of which have been paid by defendants.

**COUNT VII**
**COMMON LAW BAD FAITH**

95. Plaintiffs incorporate by reference all prior allegations.

96. To the extent any Defendant should be found not to be an insurer within the meaning of §§ 33-18-242 and 33-1-201(6), MCA, or their conduct not exclusively governed by those statutes, their actions in the sale of the CarePlus Advantage plan and the handling of Maria's claims constituted bad faith under the common law of Montana.

97. As a direct and legal result of Defendant's bad faith, Plaintiffs suffered significant economic and non-economic injuries and damages, including severe emotional distress.

## COUNT VIII
### NEGLIGENCE

98.     Plaintiffs incorporate by reference all prior allegations.

99.     To the extent any Defendant should be found not to be an insurer within the meaning of §§ 33-18-242 and 33-1-201(6), MCA, or their conduct not exclusively governed by those statutes, their actions in the sale of the CarePlus Advantage plan and the handling of Maria's claims failed to comport with the standard of reasonable care in the health coverage business and constituted negligence under the common law of Montana.

100.    As a direct and legal result of such Defendants' negligence, Plaintiffs suffered significant economic and non-economic injuries and damages, including severe emotional distress.

## COUNT IX
### NEGLIGENCE *PER SE*

101.    Plaintiffs incorporate by reference all prior allegations.

102.    To the extent any Defendant should be found not to be an insurer within the meaning of §§ 33-18-242 and 33-1-201(6), MCA, or their conduct not exclusively governed by those statutes, their actions in the sale of the CarePlus Advantage plan and the handling of Maria's claims constitute negligence *per se* in violation of subsections of § 33-18-201, MCA, and under the common law of Montana.

103.  As a direct and legal result of the negligence *per se* of such Defendants, Plaintiffs suffered significant economic and non-economic injuries and damages, including severe emotional distress.

### COUNT X
#### BREACH OF FIDUCIARY DUTY

104.  Plaintiffs incorporate by reference all prior allegations.

105.  By holding, handling, controlling, and distributing funds provided to them in trust by Plaintiffs, Defendants assumed fiduciary duties and were at material times fiduciaries with respect to those funds.  To the extent any Defendant should be found not to be an insurer within the meaning of §§ 33-18-242 and 33-1-201(6), MCA, or their conduct not exclusively governed by those statutes, their actions in the sale of the CarePlus Advantage plan and the handling of Maria's claims constitute breach of fiduciary duty under the common law of Montana.

106.  As a direct and legal result of such Defendants' breach of fiduciary duty, Plaintiffs suffered significant economic and non-economic injuries and damages, including severe emotional distress.

### COUNT XI
#### CONSUMER PROTECTION ACT

107.  Plaintiffs incorporate by reference all prior allegations.

108.  The Montana Consumer Protection Act (MCPA) prohibits unfair and deceptive Practices in any trade or commerce. § 30-14-103, MCA. To the extent any

Defendant should be found not to be an insurer within the meaning of §§ 33-18-242 and 33-1-201(6), MCA, or their conduct not exclusively governed by the Montana insurance code, the conduct of Defendants and each of them as described above violates the MCPA and constitutes unfair and deceptive acts in at least the following ways:

A.    Promising the Care Plus Advantage plan would pay 100% of medical expenses after the $10,000 deductible, which was false;

B.    Promising the Care Plus Advantage plan would protect plaintiffs from the catastrophic cost of cancer including chemotherapy treatment, which was false;

C.    Promising the Care Plus Advantage plan would provide meaningful access to doctors, hospitals and other medical providers, which was false;

D.    Pretending to support to a common specific set of religious and ethical principles as detailed in paragraph 12 above, which they did not;

E.    Promising that other Christians would have the opportunity to voluntarily assist plaintiffs in the payment of medical expenses, which was false;

F.    Placing disclaimers inconspicuously and wording them in such a way that they made the CarePlus Advantage coverage illusory;

G.    Concealing that, if Plaintiffs sustained serious illness or injury, Defendants would delay adjudication of plaintiffs' claims for months;

H.      Concealing that, if Plaintiffs sustained serious illness or injury, Defendants had no intention of paying most of Plaintiffs' claims;

I.      Concealing that, Plaintiffs developed cancer, Defendants would not pay for chemotherapy in the manner in which it was generally administered;

J.      Concealing that Defendants were engaged in a for-profit enterprise that would retain 85% of the premium dollar for themselves and make only 15% of those premium dollars available for the payment of claims;

K.      Concealing that the founding principal of Aliera was an ex-con who had been convicted of and served significant federal prison time for securities fraud and perjury;

L.      Concealing that the Care Plus Advantage plan had no adequate network of providers who had agreed to accept discounted reimbursement for medical services;

M.      Concealing that Aliera and its affiliates had been found by regulators and courts to be unlawfully selling insurance and/or had been found to be fraudulent and/or had been enjoined from selling the Care Plus Advantage plan and/or similar products in multiple states.

N.      Failing to pay any of Maria's medical expenses;

O.      Failing to timely adjudicate Plaintiffs claims;

P.      Failing to respond to Plaintiffs' thoughtful appeals for reconsideration;

Q. Repeatedly giving Plaintiffs inaccurate and misleading information and changing the reasons for non-payment of claims;

R. Repeatedly giving Maria's providers inaccurate and misleading information and changing the reasons for non-payment of claims;

S. Failing to pay medical expenses even after admitting they owed them.

109. Defendants' acts in violation of the MCPA were the direct and legal cause of injuries and damages to Plaintiffs, entitling him to actual losses, treble damages, other equitable relief, and their reasonable attorney fees, pursuant to § 30-14-133, MCA.

## COUNT XII
### JOINT TORTIOUS ENTERPRISE

110. Plaintiffs incorporate by reference all prior allegations.

111. Defendants and each of them committed these tortious acts in concert with each other and pursuant to a common design. They knew each other's conduct constitute a breach of duty and gave substantial assistance or encouragement to each other to commit these acts and the conduct of each of them, separately considered, constitutes a breach of duty to plaintiffs.

112. As a direct and legal result of the Defendants' joint tortious conduct, plaintiffs have suffered significant economic and non-economic injuries and damages, including severe emotional distress.

## COUNT XIII
### MALICE

113. Plaintiffs incorporate by reference all prior allegations.

114. The conduct of Defendants and each of them as described above constitutes actual fraud and actual malice within the meaning of § 27-1-221, MCA, entitling Plaintiffs to punitive damages for the sake of example and for the purpose of punishing the Defendants.

## COUNT IX
### PROMISSORY ESTOPPEL

115. Plaintiffs incorporate by reference all prior allegations.

116. Defendants made promises that were clear and unambiguous in their terms. To wit: to protect them against the costs of cancer treatment, including chemotherapy, if these services became necessary.  In particular, Defendants agreed with Ron and Maria that, under such circumstances, in return for Plaintiffs' payment of the monthly premium, Defendants would pay 100% of such medical expenses (up to the $500,000 limit) after Ron and Maria paid a "MSRA" deductible amount of $10,000 and made the promises detailed in paragraphs 9, 12 and 13 above.

117. Plaintiffs justifiably relied on the promises in deciding to purchase the CarePlus Advantage plan and in depending on that plan to protect them from

financial harm or ruin and ensure their access to coverage in the event of a catastrophic illness or injury.

118. It was reasonable and foreseeable that Plaintiffs would rely on Defendants' representations in deciding to purchase the CarePlus Advantage plan and in depending on that plan; indeed, the representations were made for the purpose of inducing such reliance and purchase.

119. As a result of their reliance on these promises of Defendants, Plaintiffs were injured, incurring significant uncovered medical expenses, and, in the event that a formal contract should not be found to have existed, Defendants should therefore nevertheless be estopped from denying coverage for those expenses.

## COUNT X
### EQUITABLE ESTOPPEL

120. Plaintiffs incorporate by reference all prior allegations.

121. The representations made by Defendants as alleged herein were false. Defendants knew these facts at the time the representations were made were false and knew the true facts as described above and/or the circumstances were such that knowledge of these facts is necessarily imputed to them. However, the truth concerning these facts was unknown to Plaintiffs at the time they were acted upon by them. Defendants engaged in such conduct with the intention, or at least the expectation, that their representations would be acted upon by Plaintiffs, or under circumstances both natural and probable that they would be so acted upon. Plaintiffs

did rely on Defendants' conduct (misrepresentation and concealment) and were led to act upon it in such a manner as to change their position for the worse as described in detail above, and Defendants should therefore be estopped from denying coverage for those expenses.

**COUNT XI**
**ALTER EGO**

122.   Plaintiffs incorporate by reference all prior allegations.

123.  Defendants Timothy Moses, Shelley Steele, and Chase Moses were alter egos, an instrumentalities, or agents of Aliera and/or Trinity.  On information and belief, they controlled and commingled funds, transferred funds to their own accounts for their own personal benefit, and otherwise treated the funds given in trust to Aliera and Trinity as if these funds were their own.  On further information and belief, they ran Aliera and Trinity according to their own discretion and whims, did not hold regular formal board meetings or consistently take formal minutes and did not generally observe the requirements that apply to legitimate corporations.

124.   Defendants Timothy Moses, Shelley Steele, and Chase Moses used the corporate entities of Aliera and/or Trinity as a subterfuge to defeat public convenience, justify wrong or perpetrate fraud as detailed above.

125.   Therefore, in addition to liability for their own misconduct and malfeasance, Defendants Timothy Moses, Shelley Steele, and Chase Moses are also

personally financially responsible for the liability of Defendants Aliera and Trinity as alleged, detailed, and demonstrated herein.

## REQUEST FOR RELIEF

Wherefore, Plaintiffs Ron and Maria Moeller respectfully request the following relief against Defendants:

a.    For payment of all Maria's medical expenses as billed by his providers;

b.    For consequential economic losses;

c.    For non-economic damages, including for emotional distress;

d.    For attorney fees and all litigation expenses;

e.    For prejudgment interest and post judgment interest in the amounts permitted by law;

f.    For punitive damages; and

g.    For costs of suit and such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38, F. R. Civ. P., the Plaintiffs hereby demand a trial by jury of the issues triable by right by jury.

DATED this 25th day of March, 2020.

By:    /s/ John M. Morrison
John M. Morrison
MORRISON SHERWOOD WILSON DEOLA PLLP
*Attorney for Plaintiff*